IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

**JUN 24 2015**

ARTHUR JOHNSTON
BY _____ DEPUTY

ROBERT M. BARTON

vs.                                                 CIVIL ACTION NO. 3:15cv464CWR-FKB

FRANCHISE SERVICES OF NORTH AMERICA and
THOMAS P. MCDONNELL, III                            **DEFENDANTS**

COMPLAINT
JURY TRIAL DEMANDED

COMES NOW, Plaintiff Robert M. Barton, and in support of his complaint against Defendants Franchise Services of North America, Inc. ("FSNA") and Thomas P. McDonnell, III ("McDonnell"), states as follows:

THE PARTIES

1.     Plaintiff Robert M. Barton is an adult resident citizen of the state of Florida.

2.     Defendant FSNA is a Delaware corporation with a principal place of business in Ridgeland, Mississippi.

3.     Defendant McDonnell is an adult resident citizen of the state of Mississippi.

VENUE AND JURISDICTION

4.     Venue is proper in this Court under 28 U.S.C. §1391(b) as the Defendants reside in this district.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00. Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331

because the cause of action arises in part from a violation of federal law, namely the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

FACTS

6.     Between 2006 and 2013, Barton served as an executive officer of FSNA.

7.     Between 2006 and through today, McDonnell has served as the Chief Executive Officer and Chairman of the Board of Directors of FSNA.

8.     In 2006, as part of a reverse takeover transaction, FSNA became a publically traded company. Barton was named Executive Vice President and Chief Operating Officer of FSNA.

9.     On or about November 30, 2006, Barton and FSNA entered into a stock option agreement pursuant to which Barton received 963,000 "Series A" FSNA stock options exercisable at $.1016 a share.

10.     FSNA entered into the option agreement to reward Barton for his work in leading the company and to incentivize Barton to continue his efforts. Pursuant to the 2006 stock option agreement, Barton became fully vested by May 21, 2008, and could exercise the options at any time following that date until November 30, 2016, unless his employment was terminated. In the event that Barton was terminated for cause, Barton would have 30 days following his termination to exercise his stock options. In the event that Barton was terminated without cause, Barton would have 90 days following his termination to exercise his stock options.

11.     Under the 2006 stock options agreement, in order to exercise his stock options, Barton was required to tender a check for the option value and make a written request of the company to sell him the stock. To complete the transaction, FSNA would have to issue the shares to Barton.

2

12.     In 2007, Barton was appointed to the Board of Directors of the American Car Rental Association. He became President of the Association in 2008 and served in that capacity until 2014. Barton also received the Russell Bruno award as Car Rental Executive of the year in 2009.

13.     In recognition of his continued leadership and significant contributions, Barton was promoted to President of FSNA in 2009. Pursuant to a second stock option contract executed on or about June 23, 2009, Barton received 200,000 additional stock options in FSNA, exercisable at $.14 per share. Barton became fully vested in these options as of June 23, 2013.

14.     Under the 2009 stock options agreement, in order to exercise the stock options, Barton was required to notify FSNA in writing and tender funds. To complete the transaction, FSNA would have to issue the shares to Barton.

15.     However, both the 2006 and 2009 stock option agreements provided that "FSNA options are subject to the terms and conditions of the Amended and Restated Stock Option Plan." The FSNA Amended and Restated Stock Option Plan allowed an option holder to effect a "cashless exercise," pursuant to which the Board could, in its discretion, permit a holder to surrender options and receive, in cash, the difference in value between the then-current market price and the exercise price. Unlike the procedure for tendering a formal exercise, the Plan did not require a surrendering holder to tender money or written demand when making a cashless exercise.

16.     In 2010, Barton began working on a sophisticated transaction that would ultimately result in FSNA acquiring Advantage RAC and 58 additional airport operating concessions from the Hertz Corporation to allow Hertz to gain approval from the Federal Trade Commission to acquire Dollar Thrifty Automotive Group. "The Advantage transaction"

3

involved nearly two (2) years of work and was ultimately closed in December, 2012.  As a result of this transaction, FSNA became the 4th largest car rental company in North America. McDonnell acknowledged that the deal happened because of Barton's "yeoman effort and astounding commitment."

17.    In May of 2013, FSNA re-domesticated from Calgary, Canada to Delaware, USA. As a result of the re-domestication, FSNA was prevented from issuing new stock to satisfy its obligations in the event that any option holder elected to exercise.  FSNA was negligent in failing to protect Barton's ability to exercise his options in this regard.

18.    After the Advantage deal closed, Barton's industry connections quickly produced another potentially lucrative business opportunity for FSNA.  In early 2013, Barton was contacted by representatives of Europcar, which was one of the largest car rental companies in Europe.  Europcar was interested in forming a partnership with FSNA because of the successful Advantage transaction.  McDonnell was excited about this opportunity and told Barton to "run with it."  McDonnell understood this opportunity represented a potential revenue stream of $40 - $50 million dollars for the company.  Due to Barton's efforts, the Europcar transaction was ultimately consummated, providing FSNA with a significant source of revenue.

19.    A few weeks after a meeting with Europcar executives in Boston where the technical aspects of the relationship were formalized, McDonnell asked Barton to meet with him in Orlando, Florida.  During that meeting, which took place on or about August 12, 2013, McDonnell told Barton that his employment was ending and the company wanted to negotiate a settlement so they could part ways amicably.  Barton informed McDonnell that, in addition to other recovery due under his employment contract, Barton wished to cash in his vested stock options, effectively requesting a cashless exercise.  As director of the FSNA Board, McDonnell

should have informed Barton that his request would be considered by the Board, and should have presented Barton's request to the Board for its consideration. Instead, McDonnell told Barton that, because FSNA had re-domesticated, FSNA had prevented itself from allowing option holders to exercise, but that he would consider Barton's stock option value in negotiating a settlement.

20.     Prior to this meeting, other holders had expressed interest in exercising FSNA options, which was rendered impossible due to FSNA's negligence. McDonnell and FSNA were unsure as to whether the Amended and Restated Stock Option Plan allowed for a cashless exercise to all Holders.  To remedy the problem, McDonnell had authorized FSNA's lawyers to pursue alternatives that would confirm FSNA's ability to satisfy option holders' request for a cashless exercise.

21.     Though McDonnell told Barton that FSNA had prevented itself from performing, McDonnell did not inform Barton that FSNA was making arrangements to confirm its authority to engage in a "cashless exercise" that would not require the issuance of new stock.

22.     On the day that McDonnell told Barton that he could not exercise his options, FSNA's counsel memorialized "a possible solution on our option issue."  That solution was the implementation of the right of option holders to engage in a "cashless exercise."

23.     Following the meeting in Orlando, several emails were exchanged between Barton and FSNA's representatives.

24.     On August 12, 2013, Barton sent a lengthy email to McDonnell "to document the understanding of the parties."  According to Barton's email, the parties had agreed to various terms, including Barton's claims relating to his stock options and inability to exercise those.

25.     In a follow-up email dated August 22, 2013, FSNA counsel Steve Brandon stated:

"As I appreciate matters, [Barton] was notified of the termination of his employment on August 12[th], and he and [McDonnell] reached an understanding on that date of the terms and conditions of his separation."

26.    Although McDonnell later denied that an agreement had been reached at this time, he nevertheless proceeded to inform Europcar representatives in an email dated August 14, 2013, that Barton was leaving FSNA and that this was an "agreeable decision with no animosity." McDonnell also informed the Federal Trade Commission in a letter dated August 16, 2013, that Barton was leaving FSNA to pursue other opportunities.

27.    Notwithstanding McDonnell's actions, and FSNA's counsel's representations, McDonnell did not receive FSNA Board authorization to "finalize separation discussions" with Barton until August 26, 2013. McDonnell did not inform the Board that Barton had requested to cash in his options.   In fact, McDonnell intended to prevent Barton from receiving any value for the stock options.

28.    FSNA's proposed settlement agreement included a comprehensive release which required Barton to "surrender [    ], *for no consideration*, all stock options and related rights…"

29.    In early September, 2013, Barton was sent a "Confidential Separation Agreement" which was drafted by counsel for FSNA. The Separation Agreement further recited that Barton's "employment with the Company will be terminated on September 6, 2013…regardless of whether you execute this [Separation] Agreement."

30.    Barton did not sign the Separation Agreement because it did not reflect the terms which he and McDonnell had previously agreed to as memorialized in his email of August 12, 2013.

31.    On September 9, 2013, FSNA's counsel sent a memorandum to the FSNA Board

6

members explaining the need to permit cashless exercise of stock options:

> One of the unintended consequences of the relocation of the
> domicile of Franchise Services of North America Inc. from
> Calgary to Delaware is that we are unable to issue stock under our
> option plan, as we are not registered to issue stock in the United
> States. Frank Turner and I have discussed this at some length on
> several occasions, as a former director would like to exercise his
> options, along with two employees. The exercise of options for
> an employee, executive, director or consultant now requires a case
> by case analysis, which can be tedious, whereas formerly, it was a
> relatively simple matter to accept a check and direct
> Computershare to issue stock. Frank and I believe that a cashless
> exercise of the options is the best way to go, and we also believe
> that we should engage an outside firm to assist in the management
> of this process. This requires an interpretation of our current
> Amended and Restated Stock Option Plain of the Corporation by
> you with the advice of counsel *that a cashless option is allowable*
> and is in the best interests of the Corporation.

32.     On September 17, 2013, the FSNA Board of Directors unanimously approved the

resolution permitting cashless exercise. The resolution acknowledged that "employees of the

Corporation have received Stock Options as remuneration." In order to clarify the availability of

"cashless exercise" in lieu of stock issuance, the Board confirmed:

> The Board deems it to be in the best interests of the Corporation
> that, pursuant to Section 9 of the Plan, the Corporation allow for
> the Cashless Exercise of Stock Options to be permitted for all
> Holders.

33.     Unfortunately for Mr. Barton, the Board appointed its Director, McDonnell, "to

review requests from Holders to exercise Stock Options and to determine how best to honour

such requests."

34.     Notwithstanding his specific designation to administer cashless exercises for

option holders, and his direct knowledge of Barton's request to cash out his options, McDonnell

never acted to perform Barton's cashless exercise, and never informed Barton of the Board's

resolution, the amendment to the Stock Option Plan, or Barton's rights thereunder.  McDonnell had a fiduciary duty to Barton and therefore had a duty to disclose this material information.

35.     McDonnell's misrepresentations and omissions of fact were done with scienter, and the intent to defraud Barton, in order to leave Barton with the impression that he would be unable to recover value for his options.  McDonnell's actions were improperly motivated by the desire to manufacture settlement leverage, McDonnell's personal disdain for Barton and McDonnell's desire to retaliate for Barton's attempts to change the corporate culture in a way that personally offended McDonnell's religious beliefs.

36.     Barton reasonably relied on McDonnell's misrepresentations and omissions, and suffered damages as a result.

COUNT 1 – BREACH OF CONTRACT

37.     The plaintiff incorporates all preceding paragraphs.

38.     Under the terms of his agreement, Barton was required to exercise his options within 90 days of his termination.

39.     By entering into the merger agreement, FSNA voluntarily prevented itself from performing the option contract.

40.     Further, FSNA Chairman and Chief Executive Officer Tom McDonnell informed Barton that FSNA would not and could not permit Barton to exercise his options following his termination.

41.     According to McDonnell, FSNA was legally prohibited from performing its obligations owed under the stock option agreement for the ninety days following Barton's termination in August of 2013.

42.     By voluntarily preventing itself from performing in response to an option

8

exercise, FSNA anticipatorily repudiated the stock option agreements, and rendered futile any attempt by Barton to formally exercise his options.

43. By informing Barton that it would not allow Barton to exercise his options following his termination, FSNA anticipatorily repudiated the stock option agreements, and rendered futile any attempt by Barton to formally exercise his options.

44. FSNA's anticipatory repudiation relieved Barton of any and all preconditions to exercise his options, including but not limited to any obligation to make written demand or to tender the cost of the options.

45. On August 12, 2013, Barton had effectively communicated his request for a cashless exercise under the Amended and Restated Stock Option Plan. FSNA was obligated to pay him the difference in market value.

46. By refusing to perform as agreed, FSNA breached the stock option contracts, and the Amended and Restated Stock Option Plan, entitling Barton to damages.

COUNT 2 - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

47. The Plaintiff incorporates all preceding paragraphs.

48. All contracts include an implied covenant of good faith and fair dealing.

49. FSNA breached the implied covenant of good faith and fair dealing when it refused to pay the amounts due for cashless exercise of based on an asserted inability to issue stock.

50. FSNA breached the implied covenant of good faith and fair dealing when it entered into transactions that prevented it from performing its obligations under the Stock Option Agreements.

51.     FSNA breached the implied covenant of good faith and fair dealing when it reneged on its obligations to protect Barton from the unintended consequences of its redomestication.

52.     FSNA breached the implied covenant of good faith and fair dealing when it failed or refused to consider Barton's request to cash in his stock options.

53.     FSNA breached the implied covenant of good faith and fair dealing when it designed a plan to eliminate its obligations under Barton's Stock Option Agreements and the Plan, by attempting to have Barton receive "no consideration" for his stock options.

54.     As a result of FSNA's breaches of the implied covenant of good faith and fair dealing, Barton suffered damages.

COUNT 3 - BREACH OF FIDUCIARY DUTY

55.     The plaintiff incorporates all preceding paragraphs.

56.     As Chief Executive Officer, Chairman and Director of the Board of FSNA, McDonnell owed Barton, the President and COO, a fiduciary duty.

57.     In August of 2013, McDonnell breached that duty when he told Barton that Barton would not be permitted to cash in his stock options.  At the time that McDonnell rejected Barton's request in this regard, McDonnell was well aware that the Board of Directors either had the authority to accomplish a cashless exercise, or that the Board would soon be confirming its authority in that regard.

58.     McDonnell further breached his fiduciary duty by failing to bring Barton's request to cash in his options before the FSNA Board for its determination.

59.     McDonnell further breached his fiduciary duty by attempting to "negotiate," in bad faith, the value of Barton's stock options, as if Barton was not entitled to full value of his

10

options.

60.     McDonnell further breached his fiduciary duty by attempting to have Barton accept "no consideration" for his stock options.

61.     McDonnell further breached his fiduciary duty by failing to inform Barton that the Board of Directors had approved and confirmed the "allow[ance] for the Cashless Exercise of Stock Options to be permitted for all Holders."

62.     McDonnell further breached his fiduciary duty by failing to exercise his authority to honor Barton's request to cash out his options.

63.     As a result of McDonnell's breaches of fiduciary duty, Barton suffered damages.

## COUNT 4 - FRAUD

64.     The plaintiff incorporates all preceding paragraphs.

65.     On or about August 12, 2013, in Orlando, Florida, Tom McDonnell intentionally misrepresented to Barton that Barton could not obtain the cash value of his options.

66.     On or about August 12, 2013, in Orlando, Florida, Tom McDonnell intentionally omitted the material fact that FSNA was currently working to confirm its ability to accomplish a "cashless exercise" for all option holders which would have allowed Barton to receive the value of his options without having to tender funds or be issued stock.

67.     Following September 17, 2013, Tom McDonnell intentionally did not communicate, and otherwise omitted, the material fact that the FSNA Board had approved the cashless exercise for any holder wishing to surrender his FSNA options.

69.     McDonnell's misrepresentations and omissions were made with intent and scienter and with the purpose of inducing Barton to believe that his options were worthless and that he was unable to recover value for them and to prevent Barton from recovering the value of

11

his options to which he was contractually entitled.

70.   Barton's reasonable reliance on McDonnell's misrepresentations and omissions caused him to suffer damages.

## COUNT 5 - SECURITIES FRAUD

71.   The plaintiff re-alleges all preceding paragraphs.

70.   As a holder of stock options, Barton is considered a purchaser of securities and has standing to bring a private action for damages under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

72.   Section 10(b) of the Securities Exchange Act of 1934 authorizes a claim for holders who forbear from disposing of stock options due to material misrepresentations or omissions to bring a claim for damages.

73.   As asserted above, FSNA and its CEO, Tom McDonnell, made material misrepresentations and omissions of fact which caused Barton to forbear the disposition of his options, causing him damage.

74.   FSNA and its CEO, Tom McDonnell, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

75.   By confirming the ability of all FSNA option holders to execute a "cashless exercise," and in refusing to communicate that ability to Barton, FSNA and McDonnell engaged in acts, practices and a course of business which operated as a fraud or deceit upon Barton.

76.   All of these acts, practices and omissions were "in connection with" the purchase or sale of a security.

77.   Barton is entitled to damages caused by these Securities Act violations.

## COUNT 6 - NEGLIGENCE

78.    The plaintiff re-alleges all previous paragraphs.

79.    FSNA possessed a duty to complete the re-domestication transaction in a manner that preserved option holders' contractual rights to exercise their options.

80.    FSNA knew or should have known that FSNA's failure to properly complete the re-domestication transaction would result in harm to any holders who were contractually obligated to exercise their options following a termination from the company.

81.    FSNA breached its duty by failing to properly complete the re-domestication transaction, and caused harm to Barton because FSNA could no longer honor its obligations to issue stock under the stock option agreement.

82.    Without corporate authority to do so, McDonnell terminated Barton at a time when McDonnell knew, or should have known, that Barton was prevented from exercising his options.

83.    These breaches of duty caused Barton to suffer damage.

WHEREFORE, Barton demands a judgment against FSNA and McDonnell for actual, compensatory, and punitive damages, along with both pre-judgment and post-judgment interest, and attorney fees, as authorized under both Federal and state law.

RESPECTFULLY SUBMITTED, this the 19th day of June, 2015.

By:    _____

O. Stephen Montagnet, III (MB#10049)
W. Thomas McCraney, III (MB#10171)
*ATTORNEYS FOR ROBERT M. BARTON*

13

O. Stephen Montagnet, III (MS Bar #10049)
W. Thomas McCraney, III (MS Bar#10171)
MCCRANEY MONTAGNET QUIN & NOBLE, PLLC
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone:      (601) 707-5725
Facsimile:      (601) 510-2939

14